J-S42036-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: X.F.K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.A.M., NATURAL FATHER | : | |
| | : | No. 457 MDA 2018 |

Appeal from the Order Entered February 6, 2018
in the Court of Common Pleas of Franklin County Juvenile Division
at No(s): CP-28-DP-0000002-2016

| | | |
|---|---|---|
| IN RE: ADOPTION OF: X.F.K.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.A.M., FATHER | : | No. 458 MDA 2018 |

Appeal from the Decree Entered February 6, 2018
in the Court of Common Pleas of Franklin County Orphans' Court
at No(s): 54 ADOPT 2017

BEFORE:   BOWES, MCLAUGHLIN, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:          **FILED SEPTEMBER 05, 2018**

M.A.M. (Father) appeals from the decree entered February 6, 2018, in the Court of Common Pleas of Franklin County, which terminated involuntarily his parental rights to his minor son, X.F.K.M. (Child), born in

_____

* Retired Senior Judge assigned to the Superior Court.

July 2011.[1]  Father also appeals from the order entered that same day, which changed Child's permanent placement goal to adoption.  We affirm.

Franklin County Children and Youth Services (CYS) became involved with this family in 2013, due to allegations of illegal substance abuse by Mother and poor conditions in her home.  CYS received its most recent referral in December 2015.  Mother failed multiple drug tests, and CYS developed a safety plan pursuant to which she would have only supervised contact with Child.  However, the neighbors who agreed to supervise Mother withdrew from the plan after less than a month.  Meanwhile, CYS received a report that Child was the victim of sexual abuse by his paternal grandfather.[2]  Mother and Father exercised joint custody, and Child resided in a home with paternal grandparents and Father during Father's custody periods.  Thus, Child's safety could not be assured in either parent's care. Accordingly, CYS obtained emergency protective custody of Child on

_____

[1] The trial court entered a separate decree terminating voluntarily the parental rights of Child's mother, T.M. (Mother).  Mother did not appeal the termination of her parental rights.

[2] Cumberland County Children and Youth Services conducted an investigation and deemed the report unfounded.  The report alleged initially that Child was the victim of sexual abuse by his maternal step-grandfather. Child then made statements suggesting that his paternal grandfather and Father had abused him.  By the time of the termination and goal change hearing, there was no longer any concern that Father had abused Child and the focus was solely on the paternal grandfather.

February 4, 2016, and the juvenile court[3] adjudicated him dependent by order entered February 23, 2016.

On October 10, 2017, CYS filed a petition to terminate Father's parental rights involuntarily. The trial court conducted a combined termination and goal change hearing on February 6, 2018.[4] Following the hearing, the court entered a decree terminating Father's parental rights, as well as an order changing Child's permanent placement goal to adoption. Father timely filed notices of appeal on March 7, 2018, along with concise statements of errors complained of on appeal.

Father now raises the following claims for our review.

[I.] The [juvenile] court abused its discretion in changing the permanency goal to adoption where [Father] had completed all of the services requested by [CYS] for reunification.

[II.] The [orphans'] court abused its discretion in terminating the parental rights of Father where he had completed all of the services requested by [CYS] for reunification.

Father's Brief at 5.

We begin by reviewing the decree terminating Father's parental rights involuntarily. We do so mindful of the following standard of review.

_____

[3] The Honorable Carol L. Van Horn presided over Child's initial dependency proceedings. The Honorable Angela R. Krom presided over the termination and goal change proceedings.

[4] The trial court appointed legal counsel to represent Child in compliance with 23 Pa.C.S. § 2313(a) and *In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017). Child also had the benefit of a guardian *ad litem.*

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs involuntary termination of parental rights. It requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subs]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subs]ection 2511(b): determination of the needs and welfare of the child[.]

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to subsections 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of 2511(a) as well as subsection 2511(b) in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super.

2004) (*en banc*).   Here, we analyze the court's decision to terminate

pursuant to subsections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child
> may be terminated after a petition filed on any of the following
> grounds:
>
> ***
>
> > (2) The repeated and continued incapacity, abuse,
> > neglect or refusal of the parent has caused the child
> > to be without essential parental care, control or
> > subsistence necessary for his physical or mental
> > well-being and the conditions and causes of the
> > incapacity, abuse, neglect or refusal cannot or will
> > not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights
> of a parent shall give primary consideration to the
> developmental, physical and emotional needs and welfare of the
> child.   The rights of a parent shall not be terminated solely on
> the basis of environmental factors such as inadequate housing,
> furnishings, income, clothing and medical care if found to be
> beyond the control of the parent.   With respect to any petition
> filed pursuant to subsection (a)(1), (6) or (8), the court shall not
> consider any efforts by the parent to remedy the conditions
> described therein which are first initiated subsequent to the
> giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We address first whether the trial court abused its discretion by

terminating Father's parental rights pursuant to subsection 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[]
> § 2511(a)(2), the following three elements must be met: (1)
> repeated and continued incapacity, abuse, neglect or refusal; (2)
> such incapacity, abuse, neglect or refusal has caused the child to
> be without essential parental care, control or subsistence
> necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

***In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

In its opinion, the trial court concluded that CYS presented clear and convincing evidence in support of its petition to terminate Father's parental rights pursuant to subsection 2511(a)(2). Trial Court Opinion, 4/10/2018, at 18-20. The court found that Father disbelieves Child's allegations of sexual abuse against Child's paternal grandfather and has failed to address those allegations throughout Child's twenty-four months in foster care. ***Id.*** Specifically, the court stressed that Father continues to live in a home adjacent to the home of Child's paternal grandfather. ***Id.***

Father argues that he complied with everything the trial court ordered him to do. Father's Brief at 9-14. While Father concedes that he continues to live adjacent to Child's paternal grandfather, he insists that the court never ordered him to move as a condition of reunification. ***Id.*** at 9, 15-16. Father emphasizes that Cumberland County Children and Youth Services deemed the report of sexual abuse against the paternal grandfather unfounded and that no criminal charges resulted. ***Id.*** at 14.

After a careful review of the record, we discern no abuse of discretion by the trial court. Child has reported since February 2016 that his paternal grandfather had sexually abused him. When Child came into foster care at age four, he was not developmentally on track with his age. Casework supervisor, Nicole Weller, described Child as an aggressive child who growled and made animal noises at people. He had delayed speech, was not potty trained, and had accidents during the night. Child engaged in sexualized play by opening the legs of dolls and telling people to look there. Child cried and refused to go into the bathroom to use the toilet or shower. He also cried whenever other children in the home were told to get a shower. Ms. Weller testified that these behaviors were consistent with a child who has been sexually abused. Based upon these behaviors and Child's allegations, CYS arranged for Child to undergo therapy. N.T., 2/6/2018, at 68-73.

Child has attended therapy with Scott Keller, a licensed clinical social worker, since May 2016, to help him cope with the alleged abuse. Child also disclosed sexual abuse by his paternal grandfather to Mr. Keller. Mr. Keller testified that Child expresses fear of his paternal grandfather, and opined that any contact between Child and his paternal grandfather would be contrary to his best interest.[5] N.T., 2/6/2018, at 32, 58.

_____

[5] According to Mr. Keller, Child made statements suggesting that Father may have been aware of the abuse. N.T., 2/6/2018, at 32. He explained, "I
*(Footnote Continued Next Page)*

Despite these concerns, Father continues to reside in a home adjacent to where Child's paternal grandfather lives[6] and denies that Child experienced abuse.[7] Ms. Weller testified that both homes share the same driveway and are approximately fifty yards apart.[8] *Id.* at 83. Ms. Weller recalled that Father exercised visits with Child at his home from June 2016 until September 2017. *Id.* at 104. During at least one such visit, Child observed his paternal grandfather standing outside. *Id.* at 85-86. When Child returned to his foster home, he began to display regressive behaviors such as wetting his bed. *Id.* at 86.

While Father now argues that the trial court never ordered him to move as a condition of reunification, our review of the record belies this claim. Since the beginning of this case, the orders in Child's dependency record have directed Father to obtain stable housing with a "safe and healthy living environment, free from any safety or health hazards."

*(Footnote Continued)* ─────────────

asked [Child] at one point where his father was when [he] was being hurt, and he stated he was there watching." *Id.* at 32-33.

[6] Father initially shared a home with Child's paternal grandparents, but later moved into a trailer located on their property.

[7] At first, Father insisted that the paternal grandfather could not have sexually abused Child because they were never alone together. N.T., 2/6/2018, at 121-22. However, on cross-examination, Father admitted that "[t]here is a possibility" that Child and the paternal grandfather were alone together. *Id.* at 140.

[8] Father estimated that the distance is actually twenty-five to thirty yards. N.T., 2/6/2018, at 148-49.

Dependency Order, 2/23/2016. It is apparent that a home within twenty-five to fifty yards of an alleged sexual abuser, whose presence traumatizes Child, is not a "safe and healthy living environment."

Moreover, Father conceded during the termination hearing that he knew he had to find a new home. Father testified that the "only thing that I was asked to do that I was unable to do was to change my residence." N.T., 2/6/2018, at 119-20. While Father blamed his inability to find a new home on financial difficulties, it is clear that this circumstance was not beyond his control. *See* 23 Pa.C.S. § 2511(b) ("The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent."). Father admitted that he focused his efforts on trying to buy a new home, but did not make a serious effort to rent a new home. N.T., 2/6/2018, at 131. In addition, Father admitted that his financial difficulties were partly of his own making, because he lost his job due to an act of workplace violence. *Id.* at 132. Ms. Weller explained that Father threw a trashcan at a coworker in May 2017 despite his prior anger management counseling.[9] *Id.* at 90-91, 106-07.

_____

[9] We observe that the record raises serious concerns regarding other aspects of Father's conduct. Ms. Weller testified that a woman obtained a final protection from abuse order against Father in approximately June 2017 following a hearing. *Id.* at 96. The woman alleged that Father drugged and then sexually assaulted her. *Id.*

- 9 -

We agree with the trial court that the real issue is about more than the physical location of Father's housing, but Father's failure to recognize and attend to Child's emotional needs. At the conclusion of the hearing, the trial court emphasized that a home is not just a physical space, but also a feeling of "safety and security where [Child] can feel that [Father] will take every action necessary to keep him safe and secure from anyone who would cause him harm[.] … This is a situation where [Child] says his grandfather acted inappropriately, he is afraid to be there[,] and [Father is] not paying attention." *Id.* at 175-76. The record supports the trial court's conclusion. Ms. Weller testified that despite Father's promises to move from the residence or to have paternal grandfather move from the residence,[10] his long-term intention was to return to the residence, suggesting to CYS that he did not understand the risk to Child of being in proximity to his paternal grandfather. N.T., 2/6/2018, at 87-88. In fact, during his testimony Father reiterated his belief that Child's paternal grandfather did not abuse Child. *Id.* at 123, 141-42. He stated that he would keep Child separate from Child's paternal grandfather to "do what the agency told [him to do] to get [Child] back," but planned to resume supervised contact once Child was returned. *Id.* at 124.

_____

[10] Paternal grandfather's relocation never panned out because he could not leave the area due to the terms of his probation.

Based on this evidence, the record supports the trial court's finding that Father is incapable of parenting Child, and that he cannot or will not remedy his parental incapacity pursuant to subsection 2511(a)(2). By the time of the hearing in this matter, Child had spent twenty-four months in foster care, and Father remained in no position to provide for his physical and emotional needs. As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to subsection 2511(b). Father waived any challenge to this subsection by failing to include it in his statement of questions involved and concise statement of errors complained of on appeal. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) ("Further, it is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived."). In both places, Father included only a single claim relating to his challenge to the termination of his parental rights, asserting that he "completed all of the services requested by [CYS] for reunification." Concise Statement, 3/7/2018; Father's Brief at 5. In addition, while Father's brief includes a discussion of Child's needs and

welfare in the context of subsections 2511(a)(5) and (8), it makes no mention of subsection 2511(b). *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa. Super. 2010)) ("'[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.'").

Even if Father had preserved a claim challenging subsection 2511(b), he would not be entitled to relief.

> S[ubs]ection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subs]ection 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

- 12 -

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

In this case, while the trial court found that Child shares a bond with Father, it concluded that this bond is not healthy and does not warrant preservation of Father's parental rights. Trial Court Opinion, 4/10/2018, at 23. The court reasoned that Child also has a bond with his pre-adoptive foster parents, and with his half-brother[11] who resides in the same foster home, and that the love, comfort, security, and stability Child will receive by remaining in his foster home will outweigh any detriment in severing the relationship that he has with Father. *Id.* The court also repeated its concern that Father will not address Child's basic needs of housing and protection. *Id.* at 22-23.

As part of his claim challenging subsections 2511(a)(5) and (8), Father argues that he and Child share a bond, and that Child will suffer a detriment if the trial court severs that bond. Father's Brief at 17. Father directs our attention to the testimony of Ms. Weller and Mr. Keller, as well as a bonding assessment performed by psychologist, Kasey Shienvold, Psy.D. *Id.* Father notes that Child told Mr. Keller "pretty consistently" that he wants to return to Father's care. *Id.*

---

[11] Child's half-brother is Mother's child from a different relationship.

We again discern no abuse of discretion by the trial court. As Father argues, it was undisputed during the termination hearing that he and Child share a bond. Mr. Keller testified that Child was happy to see Father during family therapy sessions and referred to him as "dad." N.T., 2/6/2018, at 33-34, 50. When Mr. Keller asked Child where he would want to live, "he has pretty consistently answered that he would want to live with [F]ather."[12] *Id.* at 56. Child stated that he likes visiting Father and that he would be sad if he did not get to see him again. *Id.* at 40-41. Mr. Keller opined that Child would likely suffer a detriment if his relationship with Father ended. *Id.* at 41.

Nonetheless, Mr. Keller believes that Child has the necessary supports in place, including his relationship with his pre-adoptive foster parents and his ongoing therapy, to help him overcome any detriment. *Id.* at 41-42. Child displays an attachment to his foster parents and refers to them as "mom and dad." *Id.* at 39-40. Ms. Weller testified that Child also has an

_____

[12] Child provided a different position to his legal counsel. Child's legal counsel, Barbara Townsend, Esquire, reported that she met with Child three times. N.T., 2/6/2018, at 155-57. During the first meeting, Child "did not seem … to be particularly interested in getting to know me or why I was there." *Id.* at 156. During the second meeting, Child became uncomfortable and "all he could do when I addressed him was to growl, and I was very disturbed by that." *Id.* Finally, during Attorney Townsend's third meeting with Child, he stated that he "would like to return to his dad's home, in so many words, but that there were problems there, and it wasn't possible." *Id.* at 156-57.

attachment to his half-brother, who resides in the same foster home.[13] *Id.* at 98-99. She added that Child refers to his half-brother as his best friend and that they love each other very much. *Id.* at 99. Ms. Weller testified that Child is doing well in his foster home and that his performance in school is improving. *Id.* at 99-100. After experiencing the security of the foster home and working through issues at therapy, Child's expressions of fear and obsession regarding the bathroom has subsided. *Id.* at 110.

Accordingly, while Child shares a bond with Father, the record supports the trial court's conclusion that the safety, security, and other emotional benefits Child will receive by remaining in his foster home, including his relationship with his pre-adoptive foster parents and his half-brother, outweigh any detriment in severing his bond with Father. *See In re Adoption of J.N.M.*, 177 A.3d 937, 946 (Pa. Super. 2018) (holding court was within its discretion by prioritizing children's safety and security needs over their relationship with their mother). Moreover, despite the bond he shares with Father and some feelings of sadness Child may experience if the relationship is severed, there is no indication in the record that such sadness would rise to the level of "extreme emotional consequences." *Id.* (citing *In re E.M.*, 620 A.2d 481, 485 (Pa. 1993)). Therefore, it is clear that

_____

[13] Mother and the father of the half-brother voluntarily relinquished their parental rights to the half-brother.

terminating Father's parental rights would best serve Child's needs and welfare pursuant to subsection 2511(b).

Next, we turn our attention to the order changing Child's permanent placement goal from reunification to adoption. Our standard of review is as follows.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

The Juvenile Act, 42 Pa.C.S. §§ 6301–6375, governs goal change proceedings. This Court has summarized the requisite analysis as follows.

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the child; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

- 16 -

Here, while Father included a challenge to the trial court's goal change order in his statement of questions involved and concise statement, he waived that claim by failing to develop it in the argument section of his brief. *See W.H.*, 25 A.3d at 339 n.3. Even if Father had developed this claim, it would be moot. *See In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect."). In light of our decision affirming the decree terminating Father's parental rights, affirming or reversing the goal change order would have no legal force or effect.

Finally, even assuming *arguendo* that Father preserved his challenge to the goal change order for our review, and that it is not moot, the trial court did not abuse its discretion. For the reasons already discussed, it is clear that changing Child's permanent placement goal to adoption is in his best interests, because Father remains incapable of providing appropriate care for Child and adoption will provide Child with a permanent and stable home after 24 months in foster care.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by terminating Father's parental rights to Child involuntarily, and that Father waived his challenge to the court's goal change order. Therefore, we affirm the court's February 6, 2018 decree and order.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 09/05/2018